# SUPREME COURT.

## CLIFTON ANGRAVE agt. EDWARD F. STONE, JOHN M. HALL and others.

The *creditors of a failing or insolvent party* are justly entitled to his *property*, and every *disposal* of it, by which creditors are prevented from reaching it, or delayed in subjecting it to the payment of their debts, is *void*, as a fraud upon their just rights.

*Held*, that upon the evidence in this action, the transaction sought to be impeached was surrounded by most of the circumstances which ordinarily attend transfers of property in fraud of creditors, and which are regarded as badges of fraud. That no sale or transfer has been allowed to stand, which has been accompanied by so many pregnant evidences of fraudulent intent—an intent to prejudice creditors by hindering and delaying them in the collection of their debts; an intent on the part of the debtor to contest or direct the disposition of his property for the benefit of himself and family, and dictate the time and manner of its application to the payment of his debts, or determine whether it should at all be so appropriated.

1. The vendors in this case were insolvent, or at least in failing circumstances, unable to meet their engagements or go on with their business, in May, 1861, or at the time of the alleged transfers.

2. If they were not actually insolvent, but were, or supposed they were, able to pay their debts if time could be obtained for the conversion and appropriation of their assets, the force of the circumstance, as evidence of fraud, was not diminished; on the contrary, the evidence is then conclusive that all the arrangements and transfers were with the sole intent and purpose of obtaining this time, without the assent of their creditors, by placing the property beyond their present reach, and thus delaying them contrary to law.

3. Suits had been commenced and judgments were to be rendered against them.

4. The principal vendor and assignor, by transfers in quick succession, conveyed to his children all his real property and real estate securities.

*New York Special Term, April,* 1863.

THE plaintiff, a judgment creditor of the firm of E. Stone & Co., brought this action to set aside as fraudulent and void a transfer of their stock of goods to the defendants, Stone and Hall. On the trial it appeared that at the time of the sale, Stone & Co. were hopelessly insolvent, which was well known to the transferees, one of whom was a young man and had been a clerk with the insolvent firm of which his father, Edward Stone, was the senior partner; that Stone & Hall were both without pecuniary respon-

bility; had never been in business on their own account, but nevertheless their notes, having a long time to run, were taken in payment for this stock. It was also proved, that about the time of this sale the defendant, Edward Stone, made conveyances and transfers of his individual property to his said son Edward F. Stone, and to his daughter. It appeared that all these transfers were made with the purpose of preventing the property in question from being applied under legal process to the payment of the creditors of E. Stone & Co. It appeared also that the notes taken in payment for this stock of goods were turned over by Edward Stone to certain of his confidential creditors. The price at which the goods were sold was fixed by taking the invoice value of the stock at a deduction of fifteen per cent.

As to the conveyances by Edward Stone, of his individual property to his son and daughter, the defendants alleged that in some instances the property conveyed was mortgaged to the full value; and where such was not the case, mortgages and notes were taken from the grantees for the difference in value, and these securities also turned over to certain confidential creditors.

The defendants also attempted to show that a part of the consideration for one of these transfers to the son, Edward F. Stone, was an indebtedness from Edward Stone to his said son, for services as clerk with the firm of E. Stone & Co., under a secret agreement known only to them; that a part of the consideration of one of the conveyances to his daughter was a claim she had upon her father for teaching the younger children of the family.

HENRY NICOLL, *for plaintiff.*
J. S. TORRANCE, *for defendants.*

ALLEN, Justice.   The evidence in this action is more full and complete than in the case of Scheitlin against the same

Angrave agt. Stone.

defendants, involving the same transactions. The differ-
ence in the case made by the evidence in the two actions
is so essential and substantial, that I am relieved from any
embarrassment resulting from a fear of seeming to go
counter to the case already decided.

I am not only at liberty to examine this case upon the
evidence, and decide it upon the merits, but I am compelled
to do so, for the reason that the cases are not the same in
many of their features and prominent circumstances. That
is, material facts and circumstances were proved upon this
trial, giving color and character to the whole transaction,
which were not brought out upon the former trial. It is not
necessary for me to refer to them in detail. It is proper
to suggest the fact, lest I should appear to overrule the
decision in the case of Scheitlin, which I would not wil-
lingly do.

Upon the evidence in this action the transaction sought
to be impeached is surrounded by most of the circumstances
which ordinarily attend transfers of property in fraud of
creditors, and which are regarded as badges of fraud. I
think no sale or transfer has been allowed to stand which
has been accompanied by so many pregnant evidences of
fraudulent intent. By fraudulent intent I mean, an intent
to prejudice creditors by hindering and delaying them in
the collection of their debts; an intent on the part of the
debtor to contest or direct the disposition of his property
for the benefit of himself and family, and dictate the time
and manner of its application to the payment of his debts,
or determine whether it shall at all be so appropriated.

There is nothing in any of the transfers of property
brought in question, or undetermined in this investigation,
indicating a sale or disposal in the usual course of busi-
ness, and for reasons which ordinarily actuate men in trans-
actions of this character; on the contrary, every circum-
stance shows the transfers to have been prompted by some
unusual motive, and as evidential of some intent other than

a mere intent to dispose of property for a fair equivalent, and devote that equivalent to the payment of just debts.

There is any design indicated rather than a design and intent to dispose of the property in order that it may be more readily and to better advantage, and at once, applied to the payment of debts. It is no answer to the suggestion of fraudulent intent clearly indicated by circumstances and facts which courts have ever and uniformly held presumptive evidence of such intent, to say, that much of the assets and proceeds of this property eventually went for the benefit of creditors. Such application may have been the result of fear or the action which creditors took or menaced, or of a successful employment of the means retained from creditors, and which enabled a dividend to be made from the fruits of the business, without at all interfering with the main design of the particular disposition of the property, to wit : securing to the assignor and his family the ultimate benefit of the property, and a support from it.

The question is what judgment the law, upon well-settled rules of evidence, and of presumption, would have pronounced upon the transaction immediately, the very day after it was consummated, not what reading may be given to it by reading it backward, in the light of subsequent acts of the parties, some of which are just and right, but which may or may not have been a part of the original plan.

It is a maxim that the creditors of a failing or insolvent party, are justly entitled to his property, and that every disposal of it by which creditors are prevented from reaching it, or delayed in subjecting it to the payment of their debts is void, as a fraud upon their just rights.

The circumstances and facts which are most prominent, but which are by no means all that are established, and which are utterly inconsistent with *bona fides*, and each of which tend to prove, by every well-settled rule of presumption, and which collectively prove, in my judgment, uncontrovertibly, the fraudulent intent charged, are :

I. That the vendors were insolvent, or at least in failing circumstances, unable to meet their engagements or go on with their business in May, 1861, or at the time of the alleged transfers.

II. If they were not actually insolvent, but were or supposed they were able to pay their debts, if time could be obtained for the conversion and appropriation of their assets, the force of the circumstances as evidence of fraud is not diminished ; on the contrary the evidence is then conclusive that all the arrangements and transfers were with the sole intent and purpose of obtaining this time, without the assent of their creditors, by placing the property beyond their present reach, and thus delaying them contrary to law.

III. Suits had been commenced and judgments were about to be rendered against them.

IV. The principal vendor and assignor by transfers in quick succession, conveyed to his children all his real property and real estate securities as follows—without attempting to give them in the order of their dates :

(1.) The Yonkers property, worth several thousand dollars over the encumbrance, was sold to the son, a young man, a clerk at $8 a week, and without means, and his mortgage taken on a long term for $4,300, thus securing to the vendor and his family, the benefit of any rise in the property, for the time the mortgage had to run, as well as the benefit of a good bargain, and a price to say the least not excessive.

(2.) A mortgage upon property at Weathersfield, Connecticut, was assigned to the same son for $5,300, and his note without security taken on time for $3,500, and the balance, $1,800, set off against a claim of the son to the same amount against the father, for extra compensation, for a period of three years in the store, under an agreement alleged to have been made at the commencement of the service, but now for the first time heard of or recognized by any act of the parties. It is enough to say that the claim is suspicious.

But the taking a note of a man without means, for the large sum of $3,500, in exchange for real estate security is unheard of in any ordinary fair business transaction. No man would think of it.

(3.) A property in Ohio was transferred to the same son about the same time. The parties seemed at a loss to determine upon what consideration the conveyance was made. They now think it was made to carry into effect a gift of the lots made some two or three years before. Mr. Edward Stone, the father, when examined upon supplemental proceedings, stated that the transfer was made to secure a debt of $2,000 to the son, probably the same debt referred to in connection with the Weathersfield mortgage. The. same debt thus being made to do double duty.

(4.) Certain lots on Thirty-seventh street, and on Eighty-fourth street, were conveyed, the former to the same son, and the latter to the daughter, Mary L. Stone, without consideration. It is claimed that the lots were encumbered to their full value, and this may be so. But, if so, the fact is nevertheless indicative of the animus of all the transfers. The grantor was willing that his children rather than his creditors should have the benefit of the equity of redemption, whether it was worth much or little.

(5.) He conveyed his dwelling-house to his unmarried daughter, Mary L. Stone, living with him, subject to an encumbrance of about $13,500, for the nominal sum or price of $19,000; of the balance nominally payable of the purchase price, $1,800 was applied in satisfaction of a debt which is claimed to have accrued from the father to the daughter, for services during a long series of years. I will not remark upon this alleged debt, except that I do not find as a fact that any such debt or claim legally existed or could have been enforced. The grantor then took a lease of the house for one year, at the nominal rent of $1,800 or $2,000, which was deducted from the purchase price, which nearly exhausted the consideration; the small balance that

remained was to be paid by the daughter upon certain claims and charges upon the property for taxes, &c., and in some other way as agreed between them, but no security was taken for these payments, and the agreement was not, I think, in writing.

(6.) The stock of goods was sold to two young men, (one the son of Mr. Stone, and a clerk with the vendors,) without means, and their notes taken at long terms, without security, in any form, even upon the goods sold.

(7.) The principal vendor became a clerk for the purchasers, and has continued from that time to this nominally in their employ, superintending and directing the business for a compensation, as is alleged, the amount of which is not fixed, he drawing from the business as his necessities required, or as he thought just.

(8.) The money received upon a sale of the dwelling-house, which was conveyed to the daughter, which was sold in a few months, was put into the business of Stone & Hall (the new firm) and used by that firm, without their being required to give the daughter, or any other person, any security or even a voucher for the same.

(9.) As occasion has required or opportunity offered, the father, Edward Stone, has turned out portions of the goods sold to Stone & Hall, in payment of his debts, and satisfied Stone & Hall by indorsing the amount upon their notes given for the purchase money.

(10.) Subsequently to the sale of the goods to Stone & Hall, the debtor firm of E. Stone & Co. transferred to the same individuals, absolutely, a large amount of the debts and choses in action belonging to them, probably the most available, in consideration of their undertaking to pay certain specified debts of the assignors, taking no security for the performance of this agreement.

(11.) Soon thereafter, and in time to prevent creditors from reaching the effects, by proceedings supplemental to execution or otherwise, the remainder of the effects of Stone

& Co. were assigned to the son, Edward J. Stone, in trust for the benefit of creditors.

(12.) There is some direct evidence—contradicted it is true—that there was an understanding or agreement that the property was to be restored to Edward Stone, and the business resumed by him whenever he could arrange his debts so that he could recommence his business without being embarrassed by them. I do not pass upon this evidence, for the reason that I do not deem it necessary.

(13.) The whole evidence shows that all these arrangements and transfers were merely for the purpose of enabling the vendor, Edward Stone, to enjoy and use the property for the benefit of himself and family, and keep the same beyond the reach of creditors, except as he should find it convenient to give it to them, and the subsequent use and employment of the property has been in execution of the original design. The creditors have only been paid such sums as the debtor himself has been able to pay by the sale of his house, and the conversion of his assets and his earnings under the firm name of Stone.& Hall; that is, the payments to the creditors have been no other or greater than could have been made in this way, had the transfer been colorable, and the business actually carried on by the assignor and vendor for his own benefit.

Of course those who have been preferred in the payment of their debts have been glad to take what was offered them, but I am constrained to pronounce the sale of the goods fraudulent and void as to the plaintiff. Judgment must be given accordingly, and a receiver must be appointed of the property, &c.